**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| LESLIE ANN KARGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 4:17-CV-3-TLS |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER OF THE | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

The Plaintiff, Leslie Ann Karger, seeks review of the final decision of the Commissioner of the Social Security Administration denying her application for Disability Insurance Benefits and Supplemental Security Income. The Plaintiff argues that the Commissioner erred by: (1) crediting the testimony of a non-examining source over that of her treating specialist and/or examining physicians; (2) failing to adequately follow the directive of the Appeals Council to reevaluate her gait instability issues and carpal tunnel limitations; and (3) failing to build a logical bridge from the evidence to her conclusions regarding the Plaintiff's residual functional capacity due to a flawed credibility determination. For the reasons set forth below, the Court REVERSES and REMANDS this case for further proceedings in accordance with this Opinion and Order.

## BACKGROUND

On January 3, 2012, the Plaintiff completed an application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 423(d), as well as an application

for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. § 1382c(a)(3), alleging disability beginning on October 1, 2010. (R. 325–337.) Her claims were denied initially on February 15, 2012, and upon reconsideration on April 12, 2012. (R. 137–38, 141–42.) An administrative law judge (ALJ) conducted a video hearing on April 30, 2013, at which the Plaintiff—who was represented by an attorney—and a vocational expert (VE) testified. (R. 109–136.) On May 31, 2013, the ALJ denied the Plaintiff's application, finding she was not disabled as of her alleged onset date. (R. 146–56.) On October 17, 2014, the Appeals Council vacated the decision and remanded the case back to the ALJ for consideration of new and material evidence related to the Plaintiff's limitations. (R. 163–64.) Specifically, the Appeals Council directed the ALJ to resolve the following issues:

> An electromyography report dated July 3, 2013, approximately one month after the decision date, indicates that the claimant has severe right carpal tunnel syndrome and moderate to severe left carpal tunnel syndrome. The decision's residual functional capacity found that the claimant can frequently handle or finger with her right upper extremity and can frequently reach (except overhead) with her left upper extremity. The residual functional capacity did not include any fingering limitations with the left upper extremity (Finding 5). The new electromyography report suggests that greater limitations may be appropriate with both the right and left upper extremities. In addition, the new records from treating source Dr. Lee indicate the claimant has gait unsteadiness, which may affect her ability to stand and/or walk for six hours in an eight-hour workday. Treatment records reflect she has been complaining of episodes of weakness and falling. Recent EEG testing has been mostly abnormal. Further consideration is necessary.

(R. 163.) The ALJ was instructed to gather additional evidence regarding the Plaintiff's gait disturbances and carpal tunnel syndrome, consider her residual functional capacity, and obtain evidence from a VE to clarify the effect of any new limitations. (R. 163–64.) Another hearing was held on September 9, 2015, at which the Plaintiff—this time appearing in person and represented by a different attorney—and a VE testified. (R. 37–108.) In addition, Jack Lebeau, M.D. (Dr. Lebeau), a physician who is board certified in cardiology and internal medicine,

testified as an impartial medical expert (ME). (R. 71–94, 1400.) In a decision dated February 29, 2016, the ALJ determined that the Plaintiff was not disabled from October 1, 2010, through the date of the decision. (R. 16–29.) On November 4, 2016, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied the Plaintiff's request for review. (R. 1–4.) The Plaintiff filed this claim in federal court against the Acting Commissioner of the Social Security Administration on January 8, 2017 [ECF No. 1].

## THE ALJ'S FINDINGS

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but also any other kind of gainful employment that exists in the national economy, considering her age, education, and work experience. §§ 423(d)(2)(A), 1382c(a)(3)(B).

An ALJ conducts a five-step inquiry in deciding whether to grant or deny benefits. 20 C.F.R. §§ 404.1520, 416.920. The first step is to determine whether the claimant no longer engages in substantial gainful activity (SGA). *Id.* In the case at hand, the ALJ found that the Plaintiff has not engaged in SGA since her alleged onset date, October 1, 2010. (R. 18.)

In step two, the ALJ determines whether the claimant has a severe impairment limiting her ability to do basic work activities under §§ 404.1520(c) and 416.920(c). In this case, the ALJ determined that the Plaintiff has multiple severe impairments, including hearing loss, fibromyalgia, degenerative disc disease, carpal tunnel syndrome, a seizure disorder, bipolar

disorder, anxiety, and a panic disorder. (R. 19.) The ALJ found that these impairments caused more than minimal limitations in the Plaintiff's ability to perform basic work activities. (*Id.*) However, the ALJ found that the Plaintiff's other alleged or diagnosed impairments, including a blood clotting disorder, a history of pulmonary embolism, dyspnea, restless leg syndrome, a hiatal hernia, acid reflux, ulcers, sleep apnea, occipital neuralgia, a history of kidney stones, and gastroesophageal reflux disease (GERD) were non-severe. (*Id.*)

Step three requires the ALJ to "consider the medical severity of [the] impairment" to determine whether the impairment "meets or equals one of [the] listings in appendix 1 . . . ." §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment(s), considered singly or in combination with other impairments, rise to this level, there is a presumption of disability "without considering [the claimant's] age, education, and work experience." §§ 404.1520(d), 416.920(d). But, if the impairment(s), either singly or in combination, fall short, the ALJ must proceed to step four and examine the claimant's "residual functional capacity" (RFC)—the types of things he can still do physically, despite his limitations—to determine whether he can perform "past relevant work," §§ 404.1520(a)(4)(iv), 416.920(A)(4)(iv), or whether the claimant can "make an adjustment to other work" given the claimant's "age, education, and work experience," §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). Here, the ALJ determined that the Plaintiff's impairments did not meet or equal any of the listings in Appendix 1 and that she had the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except:

> [S]he is limited to occasional stooping, crouching, crawling, kneeling, balance, and climbing of ramps and stairs, no climbing of ladders, ropes, or scaffolding; no exposure to hazards including slippery, wet, uneven surfaces, moving machinery, or unprotected heights; frequent handling and fingering bilaterally; she is limited to occasional overhead reach bilaterally and frequent reaching in all other directions; she should avoid work with excessive background noise, and the work should not require precise hearing or the need to distinguish or discern small or minute sounds; she is capable of conversation either in person or by phone and can avoid hazards

in the workplace; she can understand, remember, and carry out simple, routine tasks and can maintain adequate attention and concentration for those tasks; she can interact on an ongoing basis, but superficially, with coworkers and supervisors; she is limited to infrequent and superficial contact with the general public; the work can involve no fast paced production or quota; and she can manage the changes associated within a routine work setting.

(R. 19, 22.)

In doing, so, the ALJ evaluated the objective medical evidence and the Plaintiff's subjective symptoms and found that the Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. (R. 23.) For example, as is relevant to this order, the ALJ noted that the Plaintiff reported and testified as to weakness in her legs, swelling, tingling, and burning of her hands, staring spells, loss of consciousness, passing out, headaches, dizziness, and balance problems. (R. 22–23.) She also claimed she has trouble sitting, standing, or walking for long periods of time and sometimes requires the use of a cane. (R. 23.) Yet, the ALJ found that the Plaintiff's testimony and statements regarding the intensity, persistence, and limiting effects of these symptoms were "not entirely credible for the reasons explained in [the] decision." (*Id.*) The ALJ acknowledged that EMG and nerve conduction studies of the Plaintiff's upper extremities have been consistent with bilateral carpal tunnel syndrome—severe on the right and moderate-severe on the left—and that she was noted to have "decreased fine manipulation at the most recent consultative medical examination, where she demonstrated trouble manipulating objects in her fingers, buttoning a shirt, or picking up a coin." (R. 23–24.) However, her grip strength was still at 4/5 at that time, and she demonstrated a full range of motion in both wrists. (R. 24.) The Plaintiff also testified that "she can button, zip, open jars, turn doorknobs, reach forward, and reach overhead." (*Id.*)

The ALJ further noted that the Plaintiff has had "complaints of dizziness, disequilibrium, vertigo, syncope, nausea, vomiting, and headaches for many years" and that "some EEG's have

been abnormal, with sharp wave discharges." (*Id.*) Conversely, "some EEG's have been essentially normal, with no epileptiform discharges, electrographic seizures, abnormal slowing, or any other abnormalities to account for the claimant's symptoms," and "MRI's of her brain have revealed only minimal/mild deep white matter degeneration that is within the expected range." (*Id.*) Specifically as to the Plaintiff's gait and station, the ALJ recognized that it had been documented as unsteady at times and that she had been observed to use a cane to assist with balance. (*Id.*) But, at other times, her gait, station, and posture had been documented as normal and her coordination as intact. (*Id.*) The ALJ made note that the Plaintiff "did not have, or require, a cane at the hearing." (*Id.*)

With regard to the medical expert and physician opinions, the ALJ afforded the testimony of Dr. Lebeau substantial evidentiary weight, stating—in full—that "[h]is opinion is within the purview of his expertise and consistent with the record as a whole. As Dr. Lebeau correctly pointed out, there is simply insufficient objective evidence to support the claimant's contentions." (R. 25–26.) After touching briefly on what he referred to as "a series of non-disabling diagnoses," Dr. Lebeau testified to his opinion as follows:[1]

> Well there's certainly no question that no listings are met here. This is however a woman with a lot of medical condition which I've tried to go through and so forth. Strictly in combination be [inaudible] is an interesting question. I don't think that, you know, whether you take the objective meter that have that the objective lead that it adds up to a disability situation. I think she should be able to sit for hours if she had to. Maybe accommodation being a special chair. Something that supports your back.
> That she should be able walk, she should be able to stand. She should be able to handle things and if her carpal tunnel syndrome were severe and her fingers got to the point where they couldn't do delicate things in a work situation then they should be prepared.
> That's the way I put it together but I certainly grant everybody here that this is a very complicated matter and I'm giving you my understanding based up the hard evidence that I've got here. . . .

---

[1] Throughout this order, the Court has set forth the transcript testimony verbatim without making any corrections to grammar and/or spelling.

Here's what I put down. I believe that she could sit for two hours in a session and she'd get up and stretch her back and so forth, but she should be able to do six hours a day or even seven of that, you know, restful sort of thing. Standing I put one hour at a time or four hours in a day. Walking I put one hour there and only two hours a day.

And then I put down and under environmental I don't believe that she needs any special accommodation although obviously she should be at height or unprotected height around ladders or the like since after all she does have epilepsy and you never know. You don't want any stress situation or something. I have to bring out a problem and get her perched.

Let me think. I put down as far as daytime activities that they describe like getting on a bus, dressing, or cooking a small meal, or that sort of think I don't see especially when I listen to her she is an intelligent person, you know, why that should be any particular problem. Pain could make it difficult but that's something she's got to get through.

Q:[2] So in terms of posturals, you know, balancing, stooping, kneeling, crouching, and crawling, climbing ramps and stairs do you have an opinion there?

A: Yes. I think that, again she doesn't have any severe limitation of joint movements and so forth and she should be able to do, I'm trying to pick the category after occasional is?

Q: Frequent.

A: Concept?

Q: Frequent, occasional, none.

A: I would say she probably could do if those things if a job demanded it frequently not just occasionally if it was the demand of the job you know.

Q: What about manipulatives, fingering, feeling, handling, reaching?

A: Yes, I tried to mention that, you know, what we're doing with carpal tunnel syndrome here and that affects the first three fingers. It's the ulnar tunnel it affects the fourth and fifth. The little finger. So she has carpal tunnel. If she would have difficulty with manipulation it's clear evidence that nerve should be freed up.

All you have to do it take it out of the carpal tunnel and put it somewhere nearby. . . . So that's completely treatable and I just can't in mind my it's treatable and it gets better then it shouldn't be considered as a cause of disability.

(R. 72–75, 78–81.) When pressed further by the ALJ regarding manipulatives related to the Plaintiff's hands and/or fingers, Dr. Lebeau repeatedly failed to answer the question directly—focusing instead on the possibility of carpal tunnel surgery—before finally settling on no limitations. (R. 81–85.)

---

[2] These questions were tendered by the ALJ.

On the other hand, the ALJ afforded the opinions of the Plaintiff's former treating neurologist, Julian Ungar-Sargon, M.D., Ph.D. (Dr. Ungar-Sargon), and the most recent consultative examining physician, Anthony Conrardy, M.D. (Dr. Conrardy), little evidentiary weight, finding that "[t]hese opinions are not supported by the objective findings in the record and appear to be based primarily on the claimant's subjective complaints." (R. 26.) In April 2013, Dr. Ungar–Sargon opined that the Plaintiff could: (1) rarely lift or carry up to ten pounds and never anything greater than ten pounds; (2) sit for two hours, stand for one hour, and walk for less than one hour without interruption; (3) perform occasional simple grasping and frequent fine manipulation with both hands; (4) use both feet occasionally; (5) never climb, occasionally balance, stoop, and crouch, and rarely kneel or crawl; and (6) occasionally reach, push, or pull, frequently handle and feel, and continuously hear and speak. (R. 1328–1331.) Later, in November 2015, after additional medical evidence had been gathered, Dr. Conrardy examined the Plaintiff and opined that she could: (1) never lift or carry; (2) sit for fifteen minutes without interruption and up to seven hours total in a day, stand for thirty minutes without interruption and up to thirty minutes total in a day, and walk for thirty minutes without interruption and up to thirty minutes total in a day; (3) walk a few steps without the use of a cane; (4) never push or pull and only occasionally reach, handle, finger, or feel with either hand; (5) never operate foot controls; (6) never climb stairs, ramps, ladders, or scaffolds and never balance, stoop, kneel, crouch, or crawl; (7) not use a telephone to communicate or hear and understand simple commands; and (8) never tolerate or be exposed to unprotected heights, moving mechanical parts, operating a vehicle, humidity and wetness, dust, odors, and fumes, extreme cold or heat, and vibrations. (R. 1586–1595.) To support his conclusions regarding the weight given to these opinions, the ALJ essentially reiterated the medical evidence in the preceding paragraphs of her

8

decision and concluded that "inconsistencies in the claimant's symptomology and the lack of objective evidence to corroborate the alleged severity of the claimant's symptoms" warranted overruling the Plaintiff's written objection to Dr. Lebeau's testimony,[3] crediting that testimony with "substantial evidentiary weight," and giving the opinions of Dr. Ungar-Sargon and Dr. Conrardy "little evidentiary weight." (R. 26.) Finally, the ALJ credited the opinions of the State agency medical consultants with "some evidentiary weight to the extent they are consistent with the findings herein," pointing out that, while the record as a whole indicates the Plaintiff is capable of light work, she has "more restrictive postural limitations than opined by the medical consultants, as well as additional manipulative limitations and environment limitations." (*Id.*)

The Plaintiff has past relevant work as a child daycare center worker, a cafeteria attendant, and a sales clerk. (R. 27.) The ALJ found that the Plaintiff was not able to perform any past relevant work. (R. 27–28.) However, relying on the VE's testimony, the ALJ concluded that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 29.) Thus, the ALJ found that the Plaintiff was not disabled as defined in the Social Security Act. (R. 29.)

---

[3] On January 7, 2016, the Plaintiff's attorney submitted a response to the ALJ's proffer of Dr. Conrardy's consultative evaluation and medical source statement, to which she indicated she had no objection. However, as to Dr.Lebeau's testimony, she vehemently objected stating, in part, "We object to any weight being given to the testimony of Dr. Jack Lebeau. His testimony was purposefully vague and speculative." (R. 428.) The Plaintiff's attorney took issue with Dr. Lebeau's credentials to question the findings of the Plaintiff's treating neurologist, noting that Dr. Lebeau failed to cite to any contradictory findings and relied on improper speculation. (R. 428.) She further took issue with Dr. Lebeau's lack of responsiveness to direct questioning regarding limitations caused by carpal tunnel syndrome and instead relied on his unsupported contention that the Plaintiff's carpal tunnel issues could be resolved by way of surgery. (R. 429.)

**STANDARD OF REVIEW**

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). The Social Security Act establishes that the Commissioner's findings as to any fact are conclusive if supported by substantial evidence. *See Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995). Thus, the Court will affirm the Commissioner's finding of fact and denial of disability benefits if substantial evidence supports them. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2009). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Richardson*, 402 U.S. at 399–400. The reviewing court reviews the entire record; however it does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *See Diaz*, 55 F.3d at 608. A court will "conduct a critical review of the evidence," considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (internal quotations omitted).

When an ALJ recommends the denial of benefits, the ALJ must first "provide a logical bridge between the evidence and [his] conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal quotation marks and citation omitted). Though the ALJ is not required to address

every piece of evidence or testimony presented, "as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). However, if substantial evidence supports the ALJ's determination, the decision must be affirmed even if "reasonable minds could differ concerning whether [the claimant] is disabled." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## ANALYSIS

As noted above, the Plaintiff argues that the Commissioner erred by: (1) crediting the testimony of a non-examining source over that of her treating specialist and/or examining physicians; (2) failing to adequately follow the directive of the Appeals Council to reevaluate her gait instability issues and carpal tunnel limitations; and (3) failing to build a logical bridge from the evidence to her conclusions regarding the Plaintiff's residual functional capacity due to a flawed credibility determination. The Government contends that the Plaintiff's arguments are not fully developed because her brief lacks citations to the record and applicable law; it is also correctly points out that the Plaintiff's brief ends abruptly after her summary of the procedural history of the case. The Government urges the Court to find these arguments patently deficient and deem any other potential arguments waived.

While it is true that the Plaintiff's brief lacks specificity and proper citations, "[e]ven a 'woefully underdeveloped' argument is not necessarily forfeited" if the reviewing court can understand the general intended substance of it. *See United States v. Fields*, No. 09–3198, 373 Fed. Appx. 624, 626–27 (7th Cir. Apr. 29, 2010) (citing *United States v. Roque–Espinoza*, 338 F.3d 724, 727 (7th Cir. 2003)). At least with respect to the ALJ's treatment of the medical

opinions, the Court is able to decipher the essence of the Plaintiff's argument and cannot ignore

the ALJ's obvious errors; this understanding is fortified by a reading of the record itself,

including the Plaintiff's written objection to Dr. Lebeau's testimony. (R. 428–29.) Thus, "by the

slimmest of margins," the Government's contention of waiver is overruled, and the Court will

proceed to address the Plaintiff's argument on the merits. *Firkins v. Astrue*, No. 1:09-CV-00923-

JMS, 2010 WL 3037257, at *4 (S.D. Ind. Aug. 3, 2010) (analyzing the plaintiff's "woefully

inadequate" Step Three argument even though the plaintiff failed to identify and apply pertinent

facts with specificity); *see also Kline ex rel. J.H.-K. v. Colvin*, No. 11 C 50376, 2014 WL 69953,

at *11–12 (N.D. Ill. Jan. 9, 2014) (refusing to ignore the ALJ's significant errors despite the fact

that the plaintiff's arguments were undeveloped and incoherent). That said, the Plaintiff is

cautioned that, going forward, inadequately developed arguments—including those that lack the

cogent support of appropriately cited facts and case law—may not be treated as generously by a

future reviewing court and run the risk of being waived. *Id*. at *11, n.8.


A.      **The ALJ's Evaluation of Opinion Evidence**

        An ALJ is tasked with evaluating the opinion evidence in the record when making a

determination of disability. In doing so, unless a treating source's opinion is given "controlling

weight," the ALJ considers several factors to determine the appropriate weight given to any

medical opinion: (1) the examining relationship; (2) the treatment relationship; (3) the

supportability of the opinion including relevant evidence and explanations; (4) the consistency of

the opinion as viewed in light of the record; (5) whether the opinion is given by a specialist on

issues related to his or her area of expertise; and (5) any other factors which tend to support or

contradict the opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). Generally, more weight is given to

a treating physician's opinion because of his greater familiarity with the claimant's conditions and circumstances." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (citing *Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir. 1982)). In fact, a treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." §§ 404.1527(c)(2), 416.927(c)(2). When a treating physician's opinion is not given controlling weight, in addition to the factors listed above, the ALJ must also consider the length of the treatment relationship and the frequency of examination plus the nature and extent of the treatment relationship to determine what weight to give the opinion. *Id*. An ALJ may discount a treating source's medical opinion if it is internally inconsistent or inconsistent with other evidence in the record. *Apfel*, 227 F.3d at 871. An ALJ may likewise discount a treating physician's opinion if it reveals bias due to sympathy for the patient. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). Ultimately, the ALJ must give "good reasons" to support the weight he assigns to the treating source's opinion. §§ 404.1527(c)(2), 416.927(c)(2); *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). With regard to source who has examined but not treated the claimant, "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record . . . ." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); §§ 404.1527(c)(1), 416.927(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you."). "Although an ALJ is not required to accept the views of an agency examining physician if there is a contrary opinion from a later reviewer or other compelling evidence, the ALJ still must have a good explanation for rejecting or discounting the examining physician's opinion." *Czarnecki v. Colvin*, No. 14–1815, 595 Fed. Appx. 635, 642 (7th Cir. Jan.

5, 2015); *see also Andrews v. Colvin*, No. 15 C 7192, 2016 WL 4905671, at *6 (N.D. Ill. Sept. 15, 2016) ("The fact that the ALJ rejected the opinions of two of the agency's own doctors is a red flag and a good explanation is required.").

### 1. *Dr. Lebeau's Testimony and Opinion*

Here, before addressing the weight given to Dr. Ungar-Sargon's or Dr. Conrardy's opinions, the ALJ began by giving Dr. Lebeau's opinion substantial evidentiary weight. Yet, rather than discussing his testimony in any meaningful way, the ALJ simply concluded—without analysis—that Dr. Lebeau's "opinion is within the purview of his expertise and is consistent with the record as a whole" because "there is simply insufficient objective evidence to support the claimant's contentions." (R. 25–26.) This conclusory treatment of Dr. Lebeau's opinion testimony is troublesome. As will be addressed in detail below, the Court agrees with the Plaintiff that it is difficult to decipher what Dr. Lebeau's precise opinion is with regard to the relevant impairments because a reading of the transcript as a whole shows his testimony was disjointed, speculative, and oftentimes non-responsive to the questions presented by the ALJ— Dr. Lebeau seemingly jumped from topic to topic without applying the evidence to his conclusions in a logical manner before finally providing some generalized limitations. Although the Government contends that the ALJ properly applied the regulatory factors found in 20 C.F.R. §§ 404.1527(c), 416.927(c), it is certainly not apparent from the ALJ's decision itself. Of note, Dr. Lebeau's specialized credentials are not discussed in relation to the various medical issues, the supportability and consistency of his opinion in general is not adequately fleshed out, and the "other factors" pointed to in the Plaintiff's written objection are not addressed.

For example, the Government contends that the ALJ was correct in assigning more weight to Dr. Lebeau's opinion because she described it as "within the purview of his expertise." However, without additional details related to the specific content of the medical evidence considered by Dr. Lebeau, it is unclear why the opinion of a cardiologist/internist should be afforded more weight than the opinion of a treating neurologist or examining physician on issues of neurology. *See* §§ 404.1527(c)(5), 416.927(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). In her written objection that was submitted to the ALJ, the Plaintiff argued that Dr. Lebeau lacked the credentials to question the medical observations of her treating neurologist, Albert C. Lee, M.D. (Dr. Lee), stating she was troubled by Dr. Lebeau's absence of citation to any contradictory findings and his reliance on speculation including his conjecture that: (1) the "proper tests may not have been done" for issues of balance; and (2) Dr. Lee's notes regarding gait and station "were just 'carried over' in electronic records." (R. 428.) In addition to the specialization factor, this argument also calls into question the overall supportability and consistency of Dr. Lebeau's opinion and highlights its lack of logical, medically based explanations. *See* §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4). The testimony in question reads, in part, as follows:

> Gait instability. I looked into this and I had a lot of problems because examiners given through what's called a Romberg, that's R-O-M-B-E-R-G. If you stand a patient up they extend their arms forward. Then they close their arms and you stand right next to them in case they start to fall.
> You see if they can balance and hold themselves up without visual cues. That's the Romberg test. Then there are cerebellar test. That's just moving your fingers back and forth quickly or moving, you know, the thumb through the first finger, second finger, third finger, fourth finger, you know, or that kind of thing. The quick movements and coordination and so forth.
> That's not there. So I really don't know what is causing gait instability and cannot find in the record Judge an indication that she some have some disease in her brain that is causing gait instability. . . .

The gait instability I wish I could give you better advice on but all I can say is I can't find a good reason cerebellar disease or something like that that she would have gait instability. Parkinson isn't there and, you know, the rest of the things you think about with that. . . .

(R. 74–75, 77.) When subsequently questioned by the Plaintiff's attorney on the matter, Dr.

Lebeau doubled down on his stance pertaining to the alleged lack of balance testing:

> Q: Doctor is there, in looking at Dr. Lee the treating neurologist records we see every single visit notes about the gait unsteady and lack of balance.
> A: Yes.
> Q: Is there any reason to disbelieve his records?
> A: I saw this and I was frustrated honestly because with the same notes the guy seems to be competent neurologist, but he doesn't have the Romberg, the cerebellar examination, the rapid alternating movement. It's awkward.
> Q: But he did send her to balance training.
> A: There's some examinations that you do on a patient to define that to say this is cerebellar, is it vestibular is it a function of a major brain function problem, brachial. There's something like that and I don't see that in his examination. It was very frustrating because he did a good neuro examination but then he didn't do a balance check. I can't explain that but that's the fact. I really do notice that. It's a different answer.
> Q: Okay but notice then that he actually did prescribe and sent her to balance retraining? Correct?
> A: Well I didn't see where he recommended a cane and he did notice this and unfortunately when they're using the EMR now, the Electronic Medical Record if you put something down once it's carried on in perpetuity. Again I don't know how sincerely he was thinking about that because again a good neurologist.

(R. 88–89.)

The Court agrees with the Plaintiff that Dr. Lebeau relied, at least in part, on

impermissible speculation to form his opinion on gait instability and his ultimate determination

that the Plaintiff can perform frequent balancing and is not restricted in terms of her work

environment.[4] It is undisputed that the record—including the most recent medical documents—is

---

[4] Admittedly, it is unclear to the Court what Dr. Lebeau's precise opinion is with regard to environmental factors because his testimony as transcribed is less than fully coherent: "I don't believe that she needs any special accommodation although obviously she should be at height or unprotected height around ladders or the like since after all she does have epilepsy and you never know. You don't want any stress situation or something. I have to bring out a problem and get her perched." (R. 80.)

16

replete with Dr. Lee's notations of gait instability/unsteadiness (*e.g.* R. 1579, 1584, 1533, 1535, 1537, 1539, 1480, 1491, etc.) and his subsequent recommendations for balance evaluation/training (*e.g.* R. 1533, 1505, 1509, 1511, 1513, etc.) and further neurological testing (*e.g.* R. 1579, 1584, 1533, 1491, 1501, etc.). Therefore, it does not logically follow that the lack of notations to basic clinical examination procedures in the EMR means that Dr. Lee "didn't do a balance check" or calls into question Dr. Lee's findings as is alleged by Dr. Lebeau. Rather, without evidence to the contrary, it is eminently more rational to conclude that Dr. Lee—who by Dr. Lebeau's own admission is a "good neurologist"—performed typical physical balance examinations on the Plaintiff without explicitly referencing them by name in his treatment notes and observed gait disturbances severe enough to warrant further balance training/neurologic testing. Dr. Lebeau's direct assertion that Dr. Lee's notations of gait instability were simply carried over in the EMR via some unspecified technology glitch is pure, unsupported speculation. Moreover, during the hearing, Dr. Lebeau took issue with the fact that he could not find a prescription[5] for a cane from Dr. Lee in the record, seemingly inferring that Dr. Lee's notations of gait instability and recommendations for balance training were somehow suspect due to that fact. However, the Seventh Circuit has made it clear that a prescription for a cane is not required and is not probative of its need for one in the first place, so Dr. Lebeau's inference is unsupported. *See, e.g.*, *Terry*, 580 F.3d at 477–78; *see also Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). Overall, because the ALJ does not address these problems with Dr. Lebeau's opinion in her decision, it is difficult to trace her logic in crediting the opinion with substantial weight. *See Moss v. Astrue,* 555 F.3d 556, 560 (7th Cir. 2009) ("conjecture is never a permitted

---

[5] In addition to the testimony cited above, Dr. Lebeau later stated, "His patient was dizzy but maybe he mentioned to her to get a cane. It's not written that he prescribed a cane. I can't go any further with this. You know that's where it is." (R. 91.)

basis for ignoring a treating physician's views"); *Stephens v. Heckler*, 766 F.2d 284, 289 (1985) (acknowledging the general rule that "[w]hen experience backed by observation is set against the 'speculative statement' of a consulting physician, substantial evidence lies on the side of the treating physician") (citing *Allen v. Weinberger*, 552 F.2d 781, 786 (7th Cir. 1977)); *see also Reed v. Colvin*, No. 1:15-cv-00041, 2015 WL 6702127, *4 (Nov. 3, 2015) (ALJ who failed to analyze a non-treating, non-examining testifying ME's opinion and instead cited broadly to hundreds of pages of records to support her conclusion erred in "simply embrac[ing] what could be accurately characterized as fanciful speculation by [the ME] rather than any medical science based upon experience or expertise").

Dr. Lebeau's testimony pertaining to the Plaintiff's carpal tunnel syndrome and his resultant opinion that there is no need to limit the Plaintiff's handling, fingering, or manipulating is similarly troubling. In her objection, the Plaintiff took issue with the fact that Dr. Lebeau repeatedly refused to provide a straightforward answer regarding the present level of impairment to her hands; specifically, the Plaintiff's attorney stated:

> He over and over indicated that he could not ascertain a limitation due to his unsupported contention that Ms. Karger's carpal tunnel issue would be solved if she simply undergo surgery. Of course there is no showing that my client has ever been offered a surgery, or is eligible for this type of elective surgery unless and until her neurological impairments, clotting disorder and other more serious impairments resolve. An ALJ must determine if the claimant's impairments are presently disabling before moving on to consider issue of time, treatment or compliance.

(R. 429.) For his part, Dr. Lebeau testified as follows:

> She has both right and left carpal tunnel syndrome. If those are not operated that means that the surgeons are the consultants that they're satisfied with the function. It's not significantly altered. If it were then she would have carpal tunnel surgery. . . . [A]gain it would be operated if it were severe and that to my knowledge has not happened . . . . She should be able to handle things and if her carpal tunnel syndrome were severe and her fingers got to the point where they couldn't do delicate things

like tying shoes, or, you know, selecting different things in a work situation then they should be prepared. . . .

(R. 75, 77, 79.) When pressed by the ALJ, Dr. Lebeau repeated various iterations of this same opinion, stating that it was "completely treatable and I just can't in mind my it's treatable and it gets better then it shouldn't be considered as a cause of disability" and finally concluding that there was no need to limit her manipulatives. (R. 81–85.) He then stated, "I don't know if she can thread a needle now and sort of thing but these are the little things we do that test the facilities and like you say no one has felt enough that she's had enough disturbance of her life and her movements to want to operate yet." (R. 85.)

In fact, the Court has reviewed the record, and Dr. Lee's notes recommend "carpal tunnel treatment" in October 2013 (R. 1513), and Dr. Kundi's impression in August 2012 after performance of an electromyography was that the Plaintiff "would benefit from carpal tunnel release surgery bilaterally, especially on the right side" (R. 1136). Therefore, Dr. Lebeau's contention that the Plaintiff's doctors must have been fully satisfied with the current function of her hands because no physician thought her condition was severe enough to warrant surgery is inaccurate and calls into question the overall supportability of his opinion on the matter. Even assuming there was some question as to whether the Plaintiff's treating physicians had recommended carpal tunnel surgery, Dr. Lebeau's repeated assertion that the lack of surgery itself could *only* point to a lack of severity in condition is speculative and fails to take into consideration other possible reasons why surgery had not been performed, including, for example as was pointed out by the Plaintiff in her objection, the propriety and viability of release surgery in conjunction with her other ailments. During the hearing, the ALJ briefly touched upon the issue with the Plaintiff who testified that Dr. Lee told her she could "probably have surgeon or he could put shots in my wrists" but that she had not yet done anything because her back and

19

balance issues were more concerning. (R. 59–60.) However, the matter was not pressed further during the hearing or expanded upon at all in the ALJ's decision. In light of Dr. Lebeau's repeated emphasis on the absence of surgery being reflective of the Plaintiff's current condition and his view that surgery would definitively "fix" any potential future problems, the dearth of exploration or explanation of this matter by the ALJ was error. *See Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014) (an ALJ "may not draw any inferences about a claimant's condition" from the failure to follow treatment recommendations "unless the ALJ has explored the claimant's explanations as to the lack of medical care") (citation omitted). Again, because the ALJ does not address these issues in her decision, it is unclear whether she considered them at all and what relevance they played in her determination that Dr. Lebeau's opinion was entitled to substantial weight, which leaves the Court unable to trace her logic in doing so.

Finally, with regard to the Plaintiff's objection that Dr. Lebeau's testimony in general was "purposefully vague" (R. 428), the Court agrees that the level of vagueness is concerning, although there is no evidence the nebulousness was purposeful. For example, when asked directly about whether he found any inconsistencies within the record, Dr. Lebeau stated:

> Yes I did. I have occasional diagnoses. They are mentioned maybe once. They are not confirmed. I'm sorry I can't give you a list of ways because I didn't think, you know the question would come up, you know, that way, but she does have some conflicts. However, I think the basic information that I have you is based on x-rays, critical examinations which are repeated and repeatedly said the same thing and so forth and are not controversial or, you know, off the beaten path.

(R. 85–86.) This testimony is imprecise, unclear, and lacks citation to relevant evidence that would lend it any degree of supportability. See 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (the weight given to nonexamining sources depends upon "the degree to which they provide supporting explanations for their opinions" and whether those nonexamining sources "consider[ed] all of the pertinent evidence in [the record], including opinions of treating and

other examining sources"). Also, Dr. Lebeau himself seemingly acknowledged his own uncertainties and hinted at remaining questions several times during the hearing,[6] yet the ALJ's decision does nothing to clarify the vagueness of Dr. Lebeau's opinion and does not even articulate which portions of it have been adopted and which have been discounted. *See Gudgel*, 345 F.3d at 470 ("Such an inconclusive opinion cannot be a proper basis to reject a treating physician's diagnosis that is supported by test results and consistent with the claimant's subjective symptoms.").

Perhaps implicitly recognizing the issues with Dr. Lebeau's testimony, the ALJ did request a post-hearing consultative examination to further develop the Plaintiff's impairments and limitations. *See Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) ("An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable."). Yet, as will be discussed below, her decision still does not adequately address these issues given the fact that Dr. Lebeau's opinion was afforded significant weight over that of the examining physician without sufficient analysis or discussion.

---

[6] For example, Dr. Lebeau testified as follows throughout various portions of the hearing: "So I really don't know what is causing gait instability and cannot find in the record Judge an indication that she some have some disease in her brain that is causing gait instability . . . . The gait instability, I wish I could give you better advice on but all I can say is I can't find a good reason . . . ." (R. 75, 77); "That's the way I put it together but I certainly grant everybody here that this is a very complicated matter and I'm giving you my understanding based up the hard evidence that I've got here." (R. 79); "I don't have a good hand examination. What you want to do here which, I could not find, it's a huge record that I could not find any evidence of grip assessment. I don't believe it was in evidence." (R. 83); "I think this is a huge and complicated issue. I do have Saint Louis National Hearing Center calling momentarily but I would be happy to give some honest answers. Please be kind as far as time goes." (R. 88); "Again I don't know how sincerely [Dr. Lee] was thinking about that because again a good neurologist. Here's Saint Louis." (R. 89); "So this thing and, you know, I give you this file was just sort of very difficult because, you know, yes there are tender points but the active ones that are required for the diagnosis, you know, she may have fibromyalgia but, you know, it's a tough proof. That's all I'm saying." (R. 93).

## 2. *Dr. Conrardy's Physical Examination and Opinion*

At the ALJ's request, Dr. Conrardy performed a physical examination of the Plaintiff on November 30, 2015, and provided a medical source statement in conjunction with that examination. (R. 1586–95.) In the summary section of his report, Dr. Conrardy states:

> She has a slow, un-sustained, unstable gait. She can only walk a few feet without the cane. . . . She has normal gross manipulation, but decreased fine manipulation. She has trouble manipulating objects in her fingers or buttoning a shirt or picking up a coin; decreased grip strength, maybe 4/5.

(R. 1588.) In Dr. Conrardy's view, the Plaintiff is significantly more limited than what was expressed by Dr. Lebeau, specifically of relevance as to standing, walking (with the necessary aid of a cane), balancing, and fine hand manipulation. (R. 1591–93.) The ALJ determined that Dr. Conrardy's opinion was entitled to little evidentiary weight, however, stating that it was "not supported by the objective findings in the record and appear[s] to be based primarily on the claimant's subjective complaints." (R. 26.) In doing so, she lumped Dr. Ungar-Sargon's and Dr. Conrardy opinions together—even though Dr. Ungar-Sargon's opinion had been issued more than two and a half years previously, was only based on evidence received prior to that time period, and contained different limitations than either Dr. Lebeau or Dr. Conrardy—cited broadly to hundreds of pages of evidence, and concluded that there were inconsistencies in the Plaintiff's symptomology and a lack of objective evidence to corroborate the severity of her symptoms. She gave the following reasons for discounting their opinions: (1) there was "simply no explanation or diagnosis" for the Plaintiff's gait disturbance, dizziness, or syncopal episodes because her MRIs had been "relatively" normal and EEG testing had been inconsistent; (2) the Plaintiff had, at times, been observed to have normal gait, station, posture, coordination, sensation, motor function, and reflexes; (3) there was "no evidence" the Plaintiff's dizziness or

syncopal episodes had increased in intensity or frequency; and (4) the claimant testified at the hearing that she could button, zip, open jars, and turn door knobs. (R. 26.)

The Court finds that there are obvious problems with the ALJ's reasoning. For example, with regard to gait instability and balance issues, despite the ALJ's assertion to the contrary, the record *does* contain notations that the Plaintiff's dizziness and syncopal episodes were recurrent and worsening. Dr. Lee's most recent clinical indications, which are dated both pre and post-hearing, refer to the "spells [being] progressively worse at times" (R. 1580–82) and point to "more frequent spells, seizure like attacks" that are "progressively worse" plus "episodes of dizziness and unsteadiness" (R. 1481–90). In October 2013, less than six months after the original decision was issued, Dr. Lee noted that the Plaintiff had a "history of spells and unsteadiness" and had "been falling a lot recently." (R. 1510.) He made treatment recommendations accordingly. The ALJ's decision does not acknowledge this evidence. In fact, the ALJ does not mention Dr. Lee by name or discuss the medical evidence related to his treatment of the Plaintiff in any meaningful way at all; rather, she cites generally to exhibits of various medical sources as a whole in support of her contentions listed in the preceding paragraph. This is concerning considering the Appeals Council specifically directed the ALJ to resolve issues related to "new records from treating source Dr. Lee [that] indicate the claimant has gait unsteadiness, . . . has been complaining of episodes of weakness and falling" and received "[r]ecent EEG testing [that] has been mostly abnormal." (R. 163.) The ALJ's insistence that the record contains "no evidence" of increased intensity or frequency of dizziness or syncopal episodes and that there is "simply no explanation or diagnosis" for her alleged gait disturbances calls into question the validity of the ALJ's decision to discount Dr. Conrardy's opinion. *See Lopez ex rel. Lopez,* 336 F.3d at 540 ("It would have been possible for the ALJ to

decide . . . that [the claimant] presented *insufficient* evidence of [an] impairment. But in concluding that there was *no* such evidence, the ALJ actually *ignored* the available evidence and failed to explain his conclusion.") (emphasis in original). There are similar issues with the ALJ's characterization of the EEG results as "inconsistent." While it is true that some EEG results were defined as normal, a close reading of the medical record—especially the more recent evidence submitted after the ALJ's original decision—establishes that the EEG results overall were "mostly *abnormal*" as was acknowledged by the Appeals Council. Just because not every single EEG was abnormal at all times, does not mean the EEGs were inconsistent with the alleged severity of the Plaintiff's symptoms or properly served as a basis to discredit Dr. Conrardy's opinion; the ALJ failed to expand upon her logic in construing them as such.

Thus, all we are left with is the ALJ's description of the Plaintiff's MRIs as "relatively normal" and the fact that she has, at times, been observed to have normal gait, station, posture, and coordination.[7] Setting aside the ALJ's reference to the "relatively normal" MRI—the terminology of which is ambiguous—it remains undisputed that Dr. Lee, the Plaintiff's treating neurologist, repeatedly observed and made notation of the Plaintiff's gait disturbances leading up to and continuing even after the date of the second administrative hearing and recommend further neurological testing/balance training based on those observations.[8] The ALJ's decision

---

[7] In support of the contention that the Plaintiff was observed to "often" have normal gait, station, and posture, the ALJ cited broadly to "(Exhibits 3F; 6F; 19F; 24F; 29F; 35F; 40F.)" (R. 26.) The Court notes that the first three exhibits are hospital records dating from 1979 to 2012, exhibit 24F is from an urgent care facility in 2013, exhibit 29F is one month of treatment records in 2012 from a primary care facility, and the last two exhibits are from a mental health care facility from 2013 to 2015. None of the exhibits are from relevant specialists. On the other hand, the exhibits cited—again only broadly—by the ALJ for the contention that the Plaintiff's coordination has been "consistently intact" do include records from her treating neurologists; however, the ALJ does not explain why the fact that the Plaintiff's coordination has been intact negatively affects Dr. Conrardy's opinion.

[8] This evidence is discussed in detail above in the section dealing with Dr. Lebeau's testimony.

does not discuss Dr. Lee's treatment records, and she does not provide a logical reason why the observations of various medical personnel in the past serve to defeat the treating neurologist's more recent observations or cast doubt on those of the consultative examining physician. Dr. Conrardy opined that the Plaintiff was limited to thirty minutes of uninterrupted standing and walking per day and could never balance. This contrasts with the ALJ's determination that the Plaintiff was able to stand and/or walk six hours in an eight hour workday and was limited to occasional balancing and also differs from Dr. Lebeau's opinion that the Plaintiff could stand for one hour at a time or four hours in a day, could walk for one hour at a time and two hours a day, and could frequently balance. The ALJ does not address these differences in opinion, and, without additional explanation or analysis, it appears that the ALJ impermissibly substituted her own medical judgment for that of Dr. Conrardy as well as Dr. Lebeau. *See Clifford*, 227 F.3d at 870 (noting that an ALJ must not "substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record").Thus, the Court finds that the ALJ's explanation for rejecting Dr. Conrardy's opinion on gait instability and balance issues—especially in light of her incredibly sparse treatment of Dr. Lebeau's opinion which she credited with substantial weight—is not supported by substantial evidence.[9] *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1); *see also Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) ("[R]ejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled, as happened here, can be expected to cause a reviewing court to take notice

---

[9] The Court also notes that, although not directly addressed in her discussion of the opinion evidence, the ALJ took issue with the fact that the Plaintiff "did not have, or require, a cane at the hearing" (R. 24), which seemingly calls into question Dr. Conrardy's opinion that the Plaintiff requires a cane to ambulate more than a few feet at a time (R. 1588, 1591). However, the ALJ's decision ignores the Plaintiff's testimony that she left her cane "in the truck" in the parking lot when she arrived and was able to get into the building because she had a "gentleman with me and he always usually hold one of my arms and if I have a little bit of something there I can do it." (R. 55, 70.)

and await a good explanation for this unusual step."); *Lear v. Comm'r of Soc. Sec.*, No. 2:14-cv-307, 2016 WL 1165682, at *3 (N.D. Ind. Mar. 24, 2016) ("It is unusual . . . for an ALJ to reject an examining [agency] doctor's opinion because doctors hired by the agency are unlikely to be biased toward claimants the way treating physicians may be, and they are unlikely to exaggerate a claimant's disabilities.") (first citing *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013); then citing *Beardsley*, 758 F.3d at 839).

Additionally, with regard to the Plaintiff's carpal tunnel issues, while the ALJ points out that the Plaintiff testified that she can button, zip, open jars, and turn doorknobs, there was no discussion whatsoever of the average frequency of performance or the effort required in doing so. The ALJ simply asked the Plaintiff whether she could perform those tasks, and when she replied "yes," she immediately moved on to question the Plaintiff about the side effects of her medications. (R. 71.) The fact that the Plaintiff *can* perform the tasks tells us little about her ability to do so on a repeated basis and is not necessarily inconsistent with Dr. Conrardy's observations that she had slightly decreased grip strength and "trouble" with fine manipulation.

This leaves the ALJ's statement that the Plaintiff has "frequently been observed to have normal motor function, sensation, and reflexes." (R. 26.) However, the ALJ cites broadly to various exhibits and does not explain why these observations detract from Dr. Conrardy's opinion that the Plaintiff can perform only occasional bilateral handling and fingering. Of note, in his examination report, Dr. Conrardy himself clearly acknowledged that the Plaintiff had normal reflexes and normal range of motion in her elbow and wrist, yet he still concluded that she was limited in fine manipulation to occasional bilateral handling, fingering, and feeling. (R. 1587–1589.) This contrasts both with Dr. Lebeau's opinion that she was not limited at all in her manipulatives and also with the ALJ's determination that she was limited to frequent handling

and fingering bilaterally. Again, without additional explanation or analysis, it appears that the ALJ impermissibly substituted her own medical judgment for that of Dr. Conrardy as well as Dr. Lebeau. *See Clifford*, 227 F.3d at 870. The ALJ's discussion of these issues is inadequate which renders her logic untraceable and her decision unsupported by substantial evidence. *See Lopez ex rel. Lopex*, 336 F.3d at 539 (the ALJ's "decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues); *see also Beardsley*, 758 F.3d at 839; *Lear,* 2016 WL 1165682, at *3.

### 3. *Dr. Ungar-Sargon's Treatment and Opinion*

The ALJ also gave the opinion of Dr. Ungar-Sargon, the Plaintiff's former treating neurologist, little evidentiary weight. In doing so, as noted above, she failed to separate Dr. Ungar-Sargon's opinion from Dr. Conrardy's opinion, despite the fact that the opinions were distinct in both time and substance. It may well be that Dr. Ungar-Sargon's opinion relies on outdated evidence and should accordingly be weighted less in some areas. However, the ALJ's decision does not address the matter in any way. Overall, the ALJ's treatment of Dr. Ungar-Sargon's opinion suffers from the same deficiencies as those noted with regard to Dr. Conrardy; namely, her explanation for rejecting it is not supported by substantial evidence. *See Moss*, 555 F.3d at 560 ("An ALJ's conjecture is never a permitted basis for ignoring a treating physician's views."); *see also Collins v. Astrue*, No. 08–2663, 324 Fed. Appx. 516, 521 (7th Cir. May 7, 2009) ("The ALJ's flaws in reasoning might be dissipated by a fuller and more exact engagement with the facts. But that is a matter for remand because we may not seek alternative bases for the ALJ's conclusion that the record might permit.") (internal quotation marks and citations omitted). Moreover, in deciding to give Dr. Ungar-Sargon's opinion little evidentiary

weight rather than controlling weight, the ALJ did not even touch on the length, frequency of examination, nature, or extent of the treating relationship with the Plaintiff or the fact that Dr. Ungar-Sargon is a neurologist who opined on matters of neurology. Coupled with the deficiencies outlined above, this error requires remand. *See Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014) ("Even when an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ is not permitted simply to discard it. Rather, the ALJ is required by regulation to consider certain factors in order to decide how much weight to give the opinion."); *Gudgel*, 345 F.3d at 470 ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice.")

In sum, the Court finds that the ALJ failed to articulate good reasons for crediting Dr. Lebeau's opinion with substantial weight while affording Dr. Conrardy's and Dr. Ungar-Sargon's opinions little weight, making it impossible to trace her logic in doing so. Because the ALJ did not build an accurate and logical bridge from the evidence to her conclusions, remand is required on this issue, and the Court need not address the remainder of the parties' arguments. *See Moss*, 555 F.3d at 561 (explaining that an ALJ's decision to accept one physician's opinion over another's without proper consideration of the regulatory factors is sufficient reason for reversal).

**CONCLUSION**

For the reasons stated above, the Court REVERSES and REMANDS this case for further proceedings in accordance with this Opinion and Order.

SO ORDERED on October 3, 2018.

 s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT